912 F.2d 722
 Mark Lynn FORTNEY; Esley Douglas Tipton; Mary E. Tipton;
Daniel Webster Harmon; Mary Jane Harmon,
Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
ENVIROTECH CORPORATION; American Air Filter Company, Inc.;
Anacon Corp.; Southeastern Sprinkler Company, Inc.;
Grinnell Fire Protection Systems Co., Inc.; American
District Telegraph Co.; Milton Roy Company; Tate
Engineering, Inc.; Rexnord, Inc.; Drexel Brook Engineering
Co.; Rubbermaid Commercial Prod., Inc.; Unijax, Inc.;
E.I. Pfaff Co., Inc.; Simons Eastern Co.; C.P. Roberts
Engineering, Inc.; Yeargin Construction Co., Inc.; Shell
Oil Company; Devon Chemicals, Inc.; Publiker Industries,
Inc.; Buckeye Cellulose Corp.; Sybron Corp.; Carter and
Crawley, Inc., Defendants,
v.
HERCULES, INCORPORATED, Third Party Defendant.
 No. 89-3277.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 6, 1990.
Decided Aug. 30, 1990.
Rehearing and Rehearing In Banc Denied Oct. 15, 1990.
 
 Charles Stein Siegel, argued (Brian D. Weinstein, on brief), Baron & Budd, P.C., Dallas, Tex., for appellants.
 William George Cole, U.S. Dept. of Justice, Washington, D.C. (Stuart E. Schiffer, Acting Asst. Atty. Gen., Robert S. Greenspan, U.S. Dept. of Justice, Washington, D.C., John Perry Alderman, U.S. Atty., Roanoke, Va., on brief), for appellee.
 Before ERVIN, Chief Judge, and RUSSELL and CHAPMAN, Circuit Judges.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 On May 6, 1981, there was an explosion at the Radford Army Ammunition Plant ("RAAP"). This plant is owned by the U.S. Army and operated by Hercules, Inc., pursuant to a cost-plus contract. The explosion severely burned several workers, who required hospitalization. Four of the injured individuals brought this suit against the United States under the Federal Tort Claims Act ("FTCA"). This suit was dismissed by the district court, and it has been winding its way through the appellate process ever since, making stops at the Supreme Court, this court (now for the second time) and a return visit to the district court. The cause of this extended journey was a remand by the Supreme Court, which ordered a reconsideration in light of Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). Berkovitz further defined the contours of the "discretionary functions exception" ("DFE") to the FTCA. Upon remand, the district court held that the DFE need not be considered, because there was no basis for government liability under the FTCA. We agree with that ruling, and affirm.
 
 I.
 
 2
 The explosion occurred due to a defect in a recently-installed automated dehydration system for nitrocellulose. Nitrocellulose is one ingredient in the propellant of certain weapons used by the Army. As part of processing nitrocellulose, water must be removed from a nitrocellulose pulp and replaced with alcohol. For over thirty years, this process was performed manually. In the late 1960's, Hercules proposed automating the dehydration process, and the Army adopted this proposal. Hercules designed a building to house this project, the Army Corps of Engineers constructed the building, and the building was turned over to Hercules in 1978. During the second test run of this facility, the explosion occurred.
 
 
 3
 Although the government is under scrutiny in this case, Hercules bore the responsibility for safety at RAAP. Under the terms of the contract between the government and Hercules, the entire RAAP was turned over to Hercules, including all of the buildings and equipment. The contract called for Hercules to follow certain safety guidelines imposed by the government. In its contract with the Army, Hercules expressly acknowledged that none of the government regulations or oversight relieved Hercules of any responsibility for the safety for its employees, the public, or the RAAP itself.
 
 
 4
 In April of 1983, the plaintiffs filed this suit against 22 corporations that had supplied goods and services to the RAAP. In October of that year, the plaintiffs amended their complaint to add the United States as a defendant. Subsequently, the plaintiffs dismissed their suits against all of the defendants except the government.[1]
 
 
 5
 The thrust of the plaintiffs' complaint was that the government had failed to insure that Hercules used proper safety safeguards at the RAAP. This complaint was very general, and it did not state that any isolated acts or omissions on the part of the government had caused the accident.[2] At trial, however, the plaintiffs' allegations became more specific. The plaintiffs contended that two "mandatory" regulations were violated in the equipping of the processing building, and that if these violations had not been present, the explosion would not have occurred. More specifically, the plaintiffs contended that (1) the nitrocellulose should have been transported in "conductive" tubs (i.e., tubs that can conduct an electrical charge), and (2) the sprinkler system should have had a faster reaction time. To complete their theory of government liability, the plaintiffs argued that if the government had carried out a fuller safety oversight, these problems would have been detected and avoided.
 
 
 6
 Following the presentation of all of the evidence, the government made a motion to dismiss. It contended that its decision to delegate safety responsibility to Hercules and its decisions regarding the scope of government oversight were protected by the DFE. The district judge agreed, dismissed the case on that basis, and wrote a published opinion explaining his reasoning in detail.[3] See 659 F.Supp. 127 (W.D.Va.1987).
 
 
 7
 The plaintiffs made a motion for reconsideration, arguing that the district court had construed their accusations of government negligence too broadly. They argued that they did not challenge the decision to delegate responsibility for safety to Hercules or the failure to implement a system to insure safe practices by Hercules. Instead, the plaintiffs argued that allowing the processing building to pass inspection with its nonconductive tubs was negligent, and that there was no government discretion to be protected in that inspection because the regulations required these safety measures (in the plaintiffs' view).[4]
 
 
 8
 The district court rejected this motion for reconsideration on two grounds, in an unpublished memorandum opinion. Fortney v. United States, CA-83-200-A (W.D.Va. June 8, 1987). First, it held that the argument made by the plaintiffs in their motion for reconsideration was a variance from the plaintiffs' allegations in their complaint. While the motion for reconsideration argued that the plaintiffs did not quarrel with the decision to delegate safety responsibility to Hercules, and that only the tubs were challenged,[5] the complaint stated just the opposite. The complaint specifically attacked the selection of Hercules and the delegation of safety responsibility to Hercules, and never even mentioned the specific act of permitting the use of nonconductive tubs. The plaintiffs never amended their complaint in order to adopt this altered theory of negligence.
 
 
 9
 Second, the district court held that the regulations regarding tubs that were relied upon by the plaintiffs were not mandatory, contrary to the plaintiffs' allegations. The district court found that the regulations at issue were merely advisory, because they were couched in "should" terminology, instead of "shall."
 
 
 10
 The plaintiffs appealed to this court, which affirmed the district court's decision in an unpublished, per curiam opinion. Fortney v. United States, 841 F.2d 1122 (4th Cir.1988). This court upheld the finding that the delegation of safety responsibilities to Hercules was protected by the DFE. In a footnote, this court also supported the district court's other rationale in denying the motion to reconsider--that Section 20.4 did not mandate the use of nonconductive tubs. Either ground was sufficient to dispose of the appeal.
 
 
 11
 The plaintiffs then appealed to the Supreme Court, which granted certiorari, and vacated and remanded this case for further consideration in light of Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). Fortney v. United States, 488 U.S. 882, 109 S.Ct. 210, 102 L.Ed.2d 202 (1988). Berkovitz, discussed infra, clarified the test for when the DFE is applicable. Four Justices dissented from the granting of certiorari, and Justice Scalia wrote an opinion setting out the dissenters' views. Justice Scalia noted that the second opinion of the district court, and the affirming opinion of this court, had held that the regulations did not mandate the use of nonconductive tubs. Justice Scalia added that this was an adequate independent ground for denying certiorari: "Quite obviously, a Berkovitz inquiry into the mandatory or discretionary nature of a provision that has in any event not been violated is fruitless." The majority did not comment on this alternative ground for denying certiorari.
 
 
 12
 On remand, the district court found that the regulations did not require conductive tubs. 714 F.Supp. 207. In support of that finding, the district court relied on the language of the regulations and on the testimony of four expert witnesses who testified about safety procedures at RAAP. In short, the district court made it clear that the plaintiffs' theory of liability had been undermined in the trial of the case. If there was no basis for liability, then there was no need to determine if the DFE provided a reprieve from liability.
 
 
 13
 We agree with the district court's disposition of this case on remand. The appellants' primary argument concerns the use of nonconductive tubs. We are convinced, as was the district court, that the regulation concerning tubs was inapplicable to the situation at issue. A rather full accounting of the facts behind the accident is necessary to explain the basis for this conclusion.
 
 II.
 
 14
 The investigation that followed this accident indicated that the explosion occurred because the nitrocellulose became too dry during its processing. This occurred because the nitrocellulose was not being soaked with enough alcohol after the water was removed. The automated system should have applied enough alcohol to produce a 16 to 20 percent wetness in the nitrocellulose. However, on the date of the accident, only a 9 to 12 percent wetness was being achieved. This lessened wetness was not uniform; the nitrocellulose was being wetted on the top, but left dry underneath. In the processes that occurred after the wetting of the compound, this dryness proved to be disastrous.
 
 
 15
 After wetting, a combiner breaks the nitrocellulose cake into a powder. This powder then falls down a chute into a hopper, which vibrates, weighs, and loads the nitrocellulose into tubs for transport to other parts of the plant. Because the powder was too dry, the vibration in the processing caused a static charge to build up in the powder. This charge grew until a spark was discharged, igniting the flammable dust shroud that surrounded the hopper and tubs. The resulting flash fire burned the plaintiffs. It was undisputed that if the nitrocellulose had not been impermissibly dry, then the static electrical charge would not have been produced, and the explosion would not have occurred.
 
 
 16
 Trial testimony indicated that dry nitrocellulose was being produced unwittingly due to a combination of mechanical failure and human error. Before the accident, a mechanism that applied the alcohol to the nitrocellulose was malfunctioning. As part of the repair of that system, a capacitor was replaced. Unfortunately, this was a bad capacitor. Because of it, the system was applying less alcohol than the system's monitor indicated. This defect was not discovered by the engineers running this operation until after the accident.
 
 
 17
 Although the failure to apply sufficient alcohol was the cause of the accident, the plaintiffs argued at trial that if other safety procedures had been followed, then their injuries would have been avoided. We observe that the plaintiffs were forced into this line of argument in order to maintain their suit against the government. First, the plaintiffs could not sue the government due to the failure of the alcohol application system to function properly. In the government's contract with Hercules, Hercules had assumed primary responsibility for safety at RAAP. It was Hercules' responsibility to test the integrity of that system, not the government's.
 
 
 18
 Second, the plaintiffs could not argue that it was negligent to hire Hercules, or to allow Hercules the latitude it enjoyed, or to oversee safety in the way that it did, etc., because those allegations would run afoul of the "discretionary functions exception" to the FTCA. The FTCA does not permit suits against the government that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty" by the government. 28 U.S.C. Sec. 2680(a). In Berkovitz, supra, the Supreme Court set forth a two-part test for determining whether the DFE applies. First, the court must determine if the government employee was given a choice in deciding what action to take. If there is no choice, then the DFE is inapplicable. If there was a choice to be made, the government is immune under the DFE only if the choice was based on "social, economic, [or] political policy." 108 S.Ct. at 1959. The Berkovitz decision has been discussed by this court twice in the past, and we do not discuss it further here because we do not rely on the DFE in affirming the dismissal of this case. See Piechowicz v. United States, 885 F.2d 1207, 1211-13 (4th Cir.1989); Patterson v. United States, 856 F.2d 670, 673-74 (4th Cir.1988). In the case at bar, the decision to delegate safety responsibility to Hercules was clearly an economic choice, and protected by the DFE.
 
 
 19
 Due to the DFE, the plaintiffs argued that two regulations regarding safety at RAAP were mandatory, that the government was charged with enforcing them, and that the government's failure to enforce these regulations was a cause of the plaintiffs' injuries. First and foremost, the plaintiffs argued that a mandatory regulation required that conductive tubs be used to transport nitrocellulose. These tubs are labelled "conductive" because they can conduct electricity. If they are grounded, they will bleed off any accumulated electrical charge instead of allowing it to build. However, nonconductive tubs were being used to transport nitrocellulose in this process. The plaintiffs contend that the nitrocellulose was able to build a significant static charge because these tubs could not siphon off the energy as it was created, so a spark and fire resulted.
 
 
 20
 The government responded to this argument on several levels. Many of the government's arguments are not summarized here, because it is not necessary to do so under our decision. Expert testimony produced by the government demonstrated that the plaintiffs' argument regarding nonconductive tubs was a red herring. The government demonstrated that the regulations regarding the use of nonconductive tubs did not apply to wetted nitrocellulose, because that compound was not relatively explosive. Since this safety regulation was not violated, there was no basis for government liability, because the government did not fail to ensure the enforcement of a mandatory regulation as the plaintiffs had alleged.
 
 
 21
 The regulation in question was only concerned with "[c]ontainers used in intraplant transportation and service storage of explosives and explosive mixtures such as initiating explosives, pyrotechnic compositions and tracer materials." AMCR 385-100, Sec. 20.4.[6] David Skogman, the Deputy Safety Director for the Army Munitions and Chemical Command, testified that wetted nitrocellulose does not fit within this category of explosives. The regulations do not define what is included in the category "explosives and explosive mixtures," except to list "initiating explosives, pyrotechnic compositions and tracer materials" as three examples. Skogman interpreted the breadth of this category in his testimony. He testified that there is a wide range of "explosiveness" in munitions materials. Some are very sensitive, and others are quite insensitive. The examples given in the regulations are "at the very high end" of sensitivity. These materials can be set off by friction, electrostatic charges, or mere impact. Because a discharge of static electricity could set off an explosion of these sensitive materials, the regulations recommended the use of conductive tubs in transporting them.
 
 
 22
 Wetted nitrocellulose does not fit in this category of sensitive material, according to Skogman. He testified that the sensitivity of nitrocellulose depends on its wetness. If the nitrocellulose had been sufficiently wetted with alcohol (to a range of 16 to 20 percent wetness), then it would have been quite low in its sensitivity to ignition. However, the nitrocellulose involved in the explosion was much drier, and much more sensitive. Due to the malfunctioning system, only an average 9 to 12 percent wetness was being achieved. Furthermore, the wetting was not uniform, meaning that a fair portion of the nitrocellulose was not getting even that wet.
 
 
 23
 The dangerousness of this dry nitrocellulose was further explained by Thomas Ewing, who was a chemical engineer for Hercules. He testified that when the nitrocellulose reaches a certain dryness, approximately 10 percent, it will become an electrostatic hazard. The friction caused by the processing of the dry material will cause electrostatic charges to build up, and the material cannot readily siphon off those charges due to its dryness. When this built-up charge is finally released, a spark will form and an explosion will occur, as it did in this instance. In addition to this electrostatic energy problem, dry nitrocellulose is much more susceptible to ignition due to impact or heat.
 
 
 24
 Thus, the government established that if the nitrocellulose had been sufficiently wetted, then this accident would not have occurred. The plaintiffs' allegations glossed over this point. They argue that nonconductive tubs would have siphoned off the static charge in the dry nitrocellulose, preventing an accident. Yet, the cause of the accident was the failure of the system to apply sufficient alcohol, and not the use of nonconductive tubs. Since wetted nitrocellulose does not fit within the category of explosives covered by Section 20.4, there was no violation of any safety regulation.
 
 
 25
 The plaintiffs also argued that the regulations required a faster sprinkler system than the one that was installed in the processing building. The flash fire caused by the spark enveloped the plaintiffs in less than a second after ignition. The sprinkler system that was installed had a reaction time of 150 to 200 milliseconds (hereafter referred to as "150 msec sprinklers"). Testimony at trial established that this speed was the fastest that technology had produced at the time of the accident. Nonetheless, the appellants point to a regulatory provision which stated that the building "should" be equipped with sprinklers "capable of supplying water on the hazard within 50 milliseconds" ("50 msec sprinklers"). At trial, the government established that this standard was unreasonable, and that it could not have been achieved with the technology available at the time. We agree with the district court's holding that the government could not have been negligent in failing to require that 50 msec sprinklers be installed if these sprinklers were not technologically available.
 
 
 26
 Thus, we affirm the decision of the district court to dismiss the plaintiffs' case. There was no basis for government liability, for the tub regulation was inapplicable and the sprinkler regulation was unattainable. There being no basis for liability under the FTCA, there is no need to consider the DFE in this appeal.
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 The government's brief in this appeal indicates that all of the plaintiffs received workers' compensation from Hercules, and returned to work at RAAP after recovering from their injuries. There was no citation to the record to support this statement; however, it has not been disputed by the plaintiffs in their reply brief
 
 
 [2]
 Paragraph 34 of the plaintiffs' amended complaint contained 10 allegations of negligence on the part of the government. These paragraphs were general, shotgun allegations of negligence, which included all of the usual allegations (i.e., negligent hiring, failure to adequately supervise, etc.). Subparagraphs (g) and (i) of that paragraph came the closest to capturing the plaintiffs' theory at trial
 
 
 [34]
 The employees of Defendant UNITED STATES OF AMERICA were negligent in one, some and/or all of the following respects, among others, and such negligence was a proximate cause of the injuries complained of hereinbelow:
 (g) In the failure of Defendant's employees to exercise reasonable care in monitoring HERCULES, INC.'S design, construction, maintenance and/or operation of Building 3507, the processes and systems contained therein and/or the appurtenances thereto, including HERCULES, INC.'S safety program with respect thereto;
 (i) In failing to exercise reasonable care to see that government employed contractors carried out their work in a non-negligent manner....
 
 
 [3]
 The district court held that:
 The government's decisions concerning the production of munitions including its delegation to Hercules of primary responsibility for safety furthers [sic] the objectives of our national defense and, consequently, represent the nature of conduct that the d.f.e. excepts from tort liability.
 
 
 [659]
 F.Supp. at 129
 
 
 [4]
 The plaintiffs' motion for reconsideration stated, in part:
 Plaintiffs' [sic], however do not challenge the decisions to delegate primary safety responsibility to Hercules or any failure to adopt procedures to assure contractor safety compliance. Plaintiffs have no quarrel at all with the system in place at Radford in 1981 to ensure safety: the placement of primary responsibility for safety upon the contractor, and the government monitoring safety compliance. Plaintiffs do not complain of the decision to implement such a system. Rather, Plaintiffs challenge the negligence of the government safety stafff [sic] in allowing Building 3507 to pass the Pre-Operational Survey Inspection and, thereby, operate with nonconductive tubs, in violation of AMCR 385-100 (the regulations, addressed infra ).... [T]he Court is respectfully asked to reconsider its ruling and determine whether the d.f.e. is applicable to the simple choice which is charged to be negligent. A decision whether to use a conductive tub is not a social, economic or political policy decision and, therefore, does not fall within the d.f.e.
 
 
 [5]
 For some unknown reason, the plaintiffs did not raise the sprinklers issue in their motion for reconsideration. It had previously been raised in the trial of the case, along with the tubs issue. Also, the sprinklers were raised again later in the appellate process
 
 
 [6]
 A.M.C.R. 385-100 Sec. 20.4 (1970) provides:
 Hazardous material in bulk or liquid form must be transported in containers which will prevent leakage. Containers used in intraplant transportation and service storage of explosives and explosives mixtures such as initiating explosives, pyrotechnic compositions and tracer material should be made of material in the following preference order:
 Conductive rubber
 Nonferrous metal-lined boxes without seams or rivet heads under which explosive dust can accumulate
 Plastics (conductive type only)
 Paper-lined wood boxes
 Fiber containers.
 Fiber containers of bulk explosives and propellant should be shipped only by motor carrier or trailer-on-flat car. Glass containers should not be used because of their fragility and severe missile hazard.
 (Emphasis added.)