**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1451

MYNOR ABDIEL TUN-COS; JOSÉ PAJARITO SAPUT; LUIS VELASQUEZ
PERDOMO; EDER AGUILAR ARITAS; EDUARDO MONTANO
FERNÁNDEZ; PEDRO VELASQUEZ PERDOMO; JOSÉ CÁRCAMO;
NELSON CALLEJAS PEÑA; GERMÁN VELASQUEZ PERDOMO,

Plaintiffs - Appellees,

v.

B. PERROTTE, ICE Agent; T. OSBORNE, ICE Agent; D. HUN YIM, ICE Agent;
P. MANNEH, ICE Agent; A. NICHOLS, ICE Agent,

Defendants - Appellants.

---------------------------------------------------

CHRIS BURBANK; SETH M. M. STODDER; MEGAN H. MACK; MARGO
SCHLANGER; PAUL W. VIRTUE; LAWYERS COMMITTEE FOR CIVIL
RIGHTS UNDER LAW,

Amici Supporting Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria. Anthony John Trenga, District Judge. (1:17-cv-00943-AJT-TCB)

Argued: December 11, 2018                    Decided: April 26, 2019

Before NIEMEYER and QUATTLEBAUM, Circuit Judges, and DUNCAN, Senior
Circuit Judge.

Reversed and remanded with instructions by published opinion. Judge Niemeyer wrote the opinion, in which Judge Quattlebaum and Senior Judge Duncan joined.

———————————

**ARGUED:** Anne Murphy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. David Meir Zionts, COVINGTON & BURLING LLP, Washington, D.C., for Appellees. **ON BRIEF:** Chad A. Readler, Acting Assistant Attorney General, Mary Hampton Mason, Senior Trial Counsel, Paul E. Werner, Trial Attorney, Torts Branch, Barbara L. Herwig, H. Thomas Byron III, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; G. Zachary Terwilliger, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellants. Daniel E. Johnson, Mark H. Lynch, José E. Arvelo, Brandon H. Johnson, Daniel T. Grant, Michelle S. Willauer, COVINGTON & BURLING LLP, Washington, D.C.; Simon Y. Sandoval-Moshenberg, Nicholas C. Marritz, Hallie N. Ryan, LEGAL AID JUSTICE CENTER, Falls Church, Virginia, for Appellees. Jon M. Greenbaum, Myesha Braden, Samuel Weiss, Michael Huggins, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C.; Shira A. Scheindlin, New York, New York; Caitlin Bellis, UNIVERSITY OF CALIFORNIA IRVINE SCHOOL OF LAW – IMMIGRANT RIGHT CLINIC, Irvine, California, for Amicus Lawyer's Committee for Civil Rights Under Law. Nicolas G. Keller, New York, New York, Matthew E. Price, JENNER & BLOCK LLP, Washington, D.C., for Amici Chris Burbank, Seth M. M. Stodder, Megan H. Mack, Margo Schlanger, and Paul Virtue.

———————————

NIEMEYER, Circuit Judge:

Nine Latino men, who lived in areas of Northern Virginia that were home to many residents of Latino ethnicity, commenced this action against several Immigration and Customs Enforcement ("ICE") agents. They seek money damages to redress the ICE agents' alleged violations of their rights under the Fourth and Fifth Amendments, alleging that the ICE agents (1) stopped and detained them without a reasonable, articulable suspicion of unlawful activity; (2) invaded their homes without a warrant, consent, or probable cause; and (3) seized them illegally. To state a cause of action for damages, they rely on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which held that the victim of a Fourth Amendment violation by federal officers had an implied constitutional claim for damages.

The ICE agents filed a motion to dismiss, challenging the plaintiffs' reliance on *Bivens* and also asserting qualified immunity. While the district court assumed that the plaintiffs' action presents a "'modest extension' in a 'new context' for the application of a *Bivens* remedy," it denied the ICE agents' motion, concluding that a *Bivens* remedy "should be recognized in this case." It also denied the ICE agents qualified immunity.

Applying the Supreme Court's recent jurisprudence on *Bivens* actions, we reverse, concluding that a *Bivens* remedy is not available in the circumstances of this case. Where there is no statute authorizing a claim for money damages, "it is a significant step under separation-of-powers principles" for a court to impose damages liability on federal officials. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). In such cases, "[t]he question is who should decide whether to provide for a damages remedy, Congress or the courts?"

3

*Id.* at 1857 (cleaned up). "The answer most often will be Congress." *Id.* Indeed, in the course of repeatedly declining to provide a *Bivens* remedy in recent years, the Supreme Court has now made clear that "extend[ing] *Bivens* liability to any new context or new category of defendants" is highly "disfavored." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (cleaned up). We thus conclude that, because the plaintiffs seek to extend *Bivens* liability to a context the Supreme Court has yet to recognize and there are "special factors counselling hesitation in the absence of affirmative action by Congress," *Abbasi*, 137 S. Ct. at 1857 (cleaned up), the plaintiffs' action for damages should be dismissed. Therefore, we reverse the district court's order denying the ICE agents' motion to dismiss and remand with instructions to dismiss the plaintiffs' action.

I

In their complaint, the plaintiffs challenge the legality of stops, detentions, and home invasions that they experienced on February 8 and February 17, 2017.

As alleged in the complaint, on February 8, ICE agents stopped one of the plaintiffs as he was leaving his home and asked if he knew a man in a photo that the agents showed him. When the plaintiff denied knowing the man, the agents demanded that the plaintiff take them into his home. The agents then collected all of the other persons in the home, asked them the same question, and received the same response. They then arrested six residents and took them to an ICE facility in Lorton, Virginia. After ten hours, the agents released the six on bond. Removal proceedings under the

Immigration and Nationality Act ("INA") were then initiated against those six, who are now plaintiffs in this action.

On February 17, ICE agents blocked a car with four Latino men in it as they were pulling out of a parking space, demanding that they provide identification. The ICE agents then showed the detained men photos of two men, whom one of the detained men recognized. The agents then directed the detained men to go to their apartment, where the agents arrested and frisked two of them and took them to an ICE facility in Fairfax, Virginia. After they were released, removal proceedings under the INA were initiated against those two men, who are also now plaintiffs in this action.

In their initial complaint for damages, the two plaintiffs arrested on February 17 alleged violations of the Fourth and Fifth Amendments. They also asserted that the arrests on that date "did not occur in a vacuum," citing a recent Executive Order which "was represented by the Trump administration as an effort to 'take the shackles off' ICE agents in their enforcement activities." (Citation omitted). As the complaint alleged:

> ICE agents across the country have been encouraged to stop individuals without reasonable suspicion, pursuant to the Trump Administration's efforts to "take the shackles off" ICE agents to free them from "what they went through in the last administration." In contrast to the Obama Administration's immigration enforcement policies and practices, which discouraged ICE agents from stopping individuals absent reasonable suspicion that the individuals had violated federal law, . . . [the] Executive Order and implementing guidance from [the Department of Homeland Security] have encouraged a broader set of enforcement policies that "no longer will exempt classes or categories of removable aliens from potential enforcement."

(Citations omitted). The initial complaint also alleged that "[u]nder the Obama Administration, ICE agents carried out immigration arrests at [the same apartment

5

complex] multiple times a year, but generally arrested only those persons whom they had come to arrest . . . [and] generally did not engage in collateral arrests of third persons." They alleged that under the Trump Administration, by contrast, "ICE agents have dramatically increased the number and scope of enforcement actions" at the apartment complex and that "[t]hese enforcement actions have included numerous collateral arrests," including the arrests of the two plaintiffs.

Several months later, the plaintiffs filed an amended complaint, which added the events that occurred on February 8, 2017, and the additional seven plaintiffs involved in those events, one of whom was a U.S. citizen. The amended complaint again alleged claims for the unreasonable searches and seizures of the plaintiffs, in violation of the Fourth Amendment, and equal protection claims under the Fifth Amendment. It also eliminated all references to the Trump Administration's immigration enforcement policy. In both complaints, the plaintiffs demanded compensatory and punitive damages, relying on *Bivens*.

The ICE agents filed a motion to dismiss on the ground that a *Bivens* action is not available in the context of this case. The agents also asserted qualified immunity.

The district court rejected both arguments and denied the motion. First, the court concluded that the plaintiffs stated "cognizable *Bivens* claims, as those claims were against persons properly considered federal law enforcement officers under circumstances that sufficiently approximated those within the recognized contours of that remedy." Applying the framework articulated by the Supreme Court in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the court first assessed whether the case arose in a "new *Bivens*

context," noting that "[t]he alleged conduct in this case ha[d] the recognizable substance of Fourth Amendment violations" but that the agents "[were] ICE agents, rather than traditional law enforcement officers, . . . and were purporting to operate under a different 'statutory or other legal mandate' than the officials referenced in *Abbasi*." (Quoting *Abbasi*, 137 S. Ct. at 1860). For those reasons, the court "assumed that this case present[ed] a 'modest extension' in a 'new context' for the application of a *Bivens* remedy" and therefore went on to evaluate whether "special factors" counseled against extending *Bivens* by inquiring "whether '(1) Congress ha[d] not already provided an exclusive statutory remedy; (2) there [were] no special factors counselling hesitation in the absence of the affirmative action by Congress; and (3) there [was] no explicit Congressional declaration that money damages not be awarded.'" (Quoting *Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000)).

After noting that the ICE agents "d[id] not contend that Congress ha[d] already provided an exclusive statutory remedy . . . or that there [was] an 'explicit Congressional declaration that money damages not be awarded,'" the district court concluded that the issue "reduce[d] to whether any 'special factors' counsel[ed] against extending an implied right of action within the context of this case." The court then reasoned that the plaintiffs "are not challenging an entity's policy" but are rather "claiming straightforward violations of their Fourth and Fifth Amendment rights based on [the ICE agents'] conduct." And while ICE agents, rather than traditional federal law enforcement officers, were involved, the court concluded that the agents "nevertheless fall within the broad category of federal law enforcement officers, whose conduct raises the same issues and

7

concerns as in *Bivens*." As for the ICE agents' argument that "Congress's intent to preclude a *Bivens* damages remedy [could] be found in its failure to provide for an explicit remedy in the [INA] while otherwise 'aggressively' legislating in the immigration area," the court reasoned that while that argument would have force if Congress had provided a lesser remedy for this sort of violation, "Congress has provided *no remedy whatsoever*." (Emphasis added). The court concluded that "Congress's silence in this context does not reliably reflect any Congressional intent to preclude a *Bivens* damage remedy, particularly given the longstanding judicial recognition of a *Bivens* remedy for the types of Fourth and Fifth Amendment claims asserted in this case." The court thus ultimately concluded that "there [were] no special factors that would counsel against [allowing] a *Bivens* remedy for Plaintiffs' claims" and accordingly allowed the plaintiffs to pursue their *Bivens* claims against the ICE agents.

The district court also rejected the ICE agents' claim of qualified immunity. The ICE agents asserted that the complaint failed to allege "with the required specificity" the involvement of each ICE agent. The court disagreed, concluding that the plaintiffs "alleged at this stage each [ICE agent's] involvement with a sufficient level of factual specificity to give 'fair notice' of the claims asserted against each individual and the conduct relied on for those claims," and that, as such, the ICE agents "are not entitled to qualified immunity on the ground that the plaintiffs have failed to state with specificity each [ICE agent's] involvement." (Quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)).

8

From the district court's order dated April 5, 2018, denying their motion, the ICE agents filed this interlocutory appeal. *See Wilkie v. Robbins*, 551 U.S. 537, 549 n.4 (2007).

II

At its core, the plaintiffs' complaint alleges that ICE agents, in the context of enforcing the INA, violated their Fourth Amendment rights in stopping them, detaining them, and entering their home, and their Fifth Amendment rights in discriminating against them based on their ethnicity. They seek money damages under *Bivens*.

Such conduct, if engaged in by *state* officials, could give rise to a cause of action under 42 U.S.C. § 1983. But § 1983 does not provide a cause of action against *federal* officials, and there is no analogous statute imposing damages liability on federal officials.

In 1971, however, the Supreme Court decided *Bivens*, holding that, even absent statutory authorization, a man who had alleged that federal narcotics officers had searched his apartment and arrested him for alleged narcotics violations without a warrant or probable cause and that the officers had used unreasonable force in so doing could sue those officers on an implied claim for money damages under the Fourth Amendment. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389–98 (1971).

In the decade following *Bivens*, the Court decided two other cases in which it held that, notwithstanding the lack of a statutory cause of action, an implied damages remedy was available to redress certain constitutional violations. In the first, *Davis v. Passman*,

9

442 U.S. 228 (1979), the Court held that the equal protection component of the Fifth Amendment's Due Process Clause provided a damages remedy for an administrative assistant who alleged that a Congressman fired her because she was a woman. *See id.* at 248–49. And in the second, *Carlson v. Green*, 446 U.S. 14 (1980), the Court held that the Eighth Amendment's Cruel and Unusual Punishments Clause provided a damages remedy for the estate of a prisoner who died due to the alleged failure of federal jailers to treat his asthma. *See id.* at 19.

In the almost 40 years since *Carlson*, however, the Court has declined to countenance *Bivens* actions in *any* additional context. *See Chappell v. Wallace*, 462 U.S. 296, 297 (1983) (refusing to recognize a *Bivens* remedy where enlisted servicemen alleged that their officers discriminated against them based on race); *Bush v. Lucas*, 462 U.S. 367, 390 (1983) (refusing to recognize a *Bivens* remedy where a federal employee alleged that his supervisor violated his First Amendment rights); *United States v. Stanley*, 483 U.S. 669, 671–72 (1987) (refusing to recognize a *Bivens* remedy where a serviceman alleged that military officers violated his substantive due process rights); *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988) (refusing to recognize a *Bivens* remedy for alleged violations of procedural due process by Social Security officials); *FDIC v. Meyer*, 510 U.S. 471, 473–74 (1994) (refusing to recognize a *Bivens* remedy where an employee alleged that he was wrongfully terminated by a federal agency in violation of due process); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63 (2001) (refusing to recognize a *Bivens* remedy where a prisoner alleged that a private prison operator violated his Eighth Amendment rights); *Wilkie*, 551 U.S. at 541 (refusing to recognize a

10

*Bivens* remedy where a landowner alleged that officials from the Bureau of Land Management violated the Due Process Clause); *Minneci v. Pollard*, 565 U.S. 118, 120 (2012) (refusing to recognize a *Bivens* remedy where prisoners alleged that guards at a privately operated federal prison violated their Eighth Amendment rights).

The Court's most recent guidance on the continued availability of *Bivens* actions came in *Ziglar v. Abbasi*, where the Court expressed open hostility to expanding *Bivens* liability and noted that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." 137 S. Ct. at 1856. The plaintiffs in *Abbasi* — aliens who were detained and held in the aftermath of the September 11 terrorist attacks — brought an action against certain executive officials and the wardens of the facility in which they were held, alleging Fourth and Fifth Amendment violations premised on the harsh conditions of their confinement and alleged abuse by prison guards. *Id.* at 1851–53. The Court held that no *Bivens* remedy was available for the conditions-of-confinement claims and accordingly concluded that those claims should be dismissed. *See id.* at 1858–63. And it remanded the prisoner abuse claims, holding that the lower court had erred in concluding that such claims arose in the same context as *Carlson* and had therefore failed to engage in the proper analysis. *See id.* at 1865. The *Abbasi* Court explained its outlook by noting that when *Bivens*, *Davis*, and *Carlson* were decided, "the Court followed a different approach to recognizing implied causes of action than it follows now." *Id*. at 1855. More expansively, it stated:

11

> [I]n light of the changes to the Courts' general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today. To be sure, no congressional enactment has disapproved of these decisions. And it must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere.
>
> Given the notable change in the Courts' approach to recognizing implied causes of action, however, the Court has made clear that expanding the *Bivens* remedy is now a "disfavored" judicial activity. *Iqbal*, 556 U.S., at 675. This is in accord with the Courts' observation that it has "consistently refused to extend *Bivens* to any new context or new category of defendants." [*Malesko*, 534 U.S. at 68]. Indeed, the Court has refused to do so for the past 30 years.

*Id*. at 1856–57. Importantly, the Court emphasized that the question of whether to provide a *Bivens* remedy should be informed and limited by separation-of-powers principles:

> When a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, *separation-of-powers principles are or should be central to the analysis. The question is "who should decide" whether to provide for a damages remedy, Congress or the courts?* Bush, 462 U.S. at 380.
>
> The answer most often will be Congress. When an issue "'involves a host of considerations that must be weighed and appraised,'" it should be committed to "'those who write the laws'" rather than "'those who interpret them.'" *Id.* (quoting *United States v. Gilman*, 347 U.S. 507, 512–13 (1954)). In most instances, the Court's precedents now instruct, the Legislature is in the better position to consider if "'the public interest would be served'" by imposing a "'new substantive legal liability.'" *Schweiker*, 487 U.S. at 426–27 (quoting *Bush*, 462 U.S. at 390). As a result, the Court

has urged "caution" before "extending *Bivens* remedies into any new context." *Malesko*, 534 U.S. at 74.

*Id.* at 1857 (emphasis added).

Drawing from these principles and the prior cases in which it declined to extend *Bivens*, the Court then clarified the framework that now must be applied in determining whether a *Bivens* remedy is available against federal officials. *See* 137 S. Ct. at 1857–60. First, courts must inquire whether a given case presents a "new *Bivens* context." If the context is *not* new — *i.e.*, if the case is not "different in [any] meaningful way" from the three cases in which the Court has recognized a *Bivens* remedy, *id.* at 1859 — then a *Bivens* remedy continues to be available. But if the context is new, then courts must, before extending *Bivens* liability, evaluate whether there are "special factors *counselling hesitation* in the absence of affirmative action by Congress." *Id.* at 1857 (emphasis added) (cleaned up). If any such "special factors" do exist, a *Bivens* action is not available.

The Court has made clear that, for a case to be "different in a meaningful way from [the three] previous *Bivens* cases," a radical difference is not required. *Abbasi*, 137 S. Ct. at 1859. Indeed, the *Abbasi* Court, "without endeavoring to create an exhaustive list," provided several examples of "meaningful differences," some of which are quite minor:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches;

or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id*. at 1859–60; *see also id*. at 1865 ("The differences between [the *Abbasi* plaintiffs' prisoner abuse claims] and the one in *Carlson* are perhaps small, at least in practical terms. Given this Court's expressed caution about extending the *Bivens* remedy, however, *the new-context inquiry is easily satisfied*" (emphasis added)).

And in determining whether "special factors" are present to counsel hesitation in expanding *Bivens*, courts must consider "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857–58. If a factor exists that "cause[s] a court to hesitate before answering that question in the affirmative," then a *Bivens* remedy is unavailable. *Id*. at 1858. "In sum, if there are sound reasons to think Congress *might doubt* the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, then courts *must refrain* from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.* (emphasis added).

III

Applying these principles to the case before us, we address first whether this case arises in a new *Bivens* context — a context distinct from the contexts in the Supreme Court's three *Bivens* cases. If the case does arise in a new context, we must then inquire as to whether there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857 (cleaned up).

14

A

The ICE agents contend that because this case arises in the immigration context —
*i.e.*, because it concerns ICE agents' enforcement of the INA, rather than traditional law
enforcement officers' enforcement of the criminal law, as in *Bivens* — it presents a new
*Bivens* context. The plaintiffs respond that while this may be a difference, it is not a
*meaningful* one, as required by *Abbasi*. Indeed, they contend that this case arises
"squarely" in the same "search-and-seizure context 'in which [*Bivens*] arose'" (quoting
*Abbasi*, 137 S. Ct. at 1856) and that, like in *Bivens*, the instant action is against individual
line-level officers for violations of the Fourth Amendment. In addition, the plaintiffs
argue that their allegations concern actions taken prior to the commencement of any
removal proceeding under the INA and therefore that the INA is not relevant to the
*Bivens* inquiry.

Agreeing with the ICE agents, we conclude that the plaintiffs' position fails to
reckon with the Supreme Court's specific guidance regarding the new-context inquiry.
Following that guidance, we find that several of the differences identified in *Abbasi* are
present in this case.

First, "the statutory or other legal mandate under which the officer[s] [were]
operating" is distinct. *Abbasi*, 137 S. Ct. at 1860. The ICE agents were not enforcing the
criminal law, as in *Bivens*, but rather were enforcing the immigration law of the INA.
*See id*. The plaintiffs attempt to trivialize this difference, arguing at a general level that
because the ICE agents are "federal law enforcement officers" alleged to have
"committed unconstitutional searches and seizures," this case arises in the same context

15

as *Bivens* regardless of the statutory mandate under which the ICE agents were operating. Arguing at so general a level, however, not only ignores the language of *Abbasi*, it also fails to appreciate the substantively distinct aspects of immigration enforcement. Immigration enforcement is by its nature addressed toward noncitizens, which raises a host of considerations and concerns that are simply absent in the majority of traditional law enforcement contexts. Indeed, the Supreme Court has recognized as such and has distinguished between immigration enforcement and criminal law enforcement in the past. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050–51 (1984) (holding that the criminal-law exclusionary rule does not apply in removal proceedings); *cf. id*. at 1044 (noting that "[m]ost arrests of illegal aliens away from the border occur during farm, factory, or other workplace surveys. Large numbers of illegal aliens are often arrested at one time, and conditions are understandably chaotic"). And more generally, the INA takes an approach to enforcement that is distinct from the approach taken by criminal laws, favoring arrest and detention *for the purpose of removal* from the United States, while the criminal law imposes incarceration *for the distinct purposes stated in 18 U.S.C. § 3553(a)*.

Also, enforcement of the immigration laws implicates broad policy concerns distinct from the enforcement of criminal law. Indeed, the plaintiffs recognized as much in their initial complaint, pointing out the significance of the Trump Administration's immigration policy to their case and emphasizing the differences between the policies of the Obama Administration and the Trump Administration:

16

In contrast to the Obama Administration's immigration enforcement policies and practices, which discourage ICE agents from stopping individuals absent reasonable suspicion that the individuals had violated federal law, the January 25, 2017 Executive Order [of the Trump Administration] and implementing guidance from [the Department of Homeland Security] have encouraged a broader set of enforcement priorities that "no longer will exempt classes or categories of removable aliens from potential enforcement."

(Citing Department of Homeland Security memoranda from the two Administrations).

In addition, as part of the new-context analysis, the *Abbasi* Court "refused to extend *Bivens* to any . . . *new category* of defendants," and pointed out categories that had been found to be meaningfully distinct from the three *Bivens* cases, such as "federal employer[s]," "military officers," "Social Security officials," a "federal agency," a "private prison operator," "officials from the Bureau of Land Management," and "prison guards at a private prison." *Abbasi* 137 S. Ct. at 1857 (emphasis added). So it is in this case that the plaintiffs seek to extend *Bivens* liability to a new category of defendants — ICE agents, who are charged with the enforcement of the immigration laws.

Further, the plaintiffs' Fifth Amendment claims have no analogue in the Supreme Court's prior *Bivens* cases. In effect, the plaintiffs attempt to wed the Fifth Amendment equal protection claim of *Davis v. Passman*, which concerned a Congressman firing his female secretary, *see* 442 U.S. at 230–31, with the Fourth Amendment claim of *Bivens*. But such hybridization cannot alter the fact that the plaintiffs' claim of discrimination "bear[s] little resemblance to the three *Bivens* claims the Court has approved in the past." *Abbasi*, 137 S. Ct. at 1860.

17

In short, as the *Abbasi* Court noted, "even a modest extension is still an extension" for purposes of the new-context analysis, 137 S. Ct. at 1864, and the district court was correct in recognizing this in its opinion. Because the plaintiffs seek to extend *Bivens* liability to a new context, we must now inquire as to whether there are any "special factors counselling hesitation [in extending *Bivens* liability] in the absence of affirmative action by Congress." *Id*. at 1857.

B

In determining whether "special factors" are present, we focus on whether Congress *might doubt* the need for an implied damages remedy. *See Abbasi*, 137 S. Ct. at 1858.

Arguing that "special factors" do exist in this case, the ICE agents point to the complex and comprehensive nature of the INA, as well as the "sheer size" of the immigration system. They emphasize that Congress omitted a private damages remedy for constitutional violations arising from immigration enforcement and investigations while pervasively regulating other aspects of immigration policy and argue that this suggests that Congress intended to exclude such a remedy. The Judiciary's recognition of such a remedy absent statutory authorization would thus, according to the ICE agents, raise grave separation-of-powers concerns. In addition, the ICE agents point to immigration's relation to foreign policy and diplomacy and contend that the plaintiffs' action, in purpose and effect, seeks to alter immigration enforcement policy, which is a role for the Executive, not the Judiciary.

18

The plaintiffs, by contrast, argue that they are only challenging "run-of-the-mill, unconstitutional law enforcement activity by individual law enforcement agents" and that "this case is not about the U.S. 'immigration system'" as such. The plaintiffs also emphasize that, while the INA does provide "various procedural mechanisms to individuals who have been placed in removal proceedings," the INA "does *not* provide a remedial scheme for violations committed by immigration officials outside of removal proceedings." (Quoting *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 218 (D. Conn. 2010)).

Again, we conclude that the plaintiffs' position fails to take account of the Supreme Court's specific instructions about extending *Bivens* claims. As the ICE agents argue, because immigration enforcement is, at bottom, about ensuring that only those foreign nationals who are legally authorized to be in the United States remain present here, such enforcement has "the natural tendency to affect diplomacy, foreign policy, and the security of the nation, which . . . counsel hesitation in extending *Bivens*." *Mirmehdi v. United States*, 689 F.3d 975, 983 (9th Cir. 2012) (cleaned up); *see also Abbasi*, 137 S. Ct. 1861–62 (concluding that plaintiffs' claims would "of necessity require an inquiry into sensitive issues of national security" and that this fact "counsell[ed] hesitation 'in the absence of affirmative action by Congress.'" (citation omitted)); *cf. Vanderklok v. United States*, 868 F.3d 189, 209 (3d Cir. 2017) ("[T]he role of the TSA in securing public safety is so significant that we ought not create a damages remedy in this context").

Moreover, immigration enforcement is "a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want

19

the Judiciary to interfere." *See Abbasi*, 137 S. Ct. at 1858 (citing *Chappell*, 462 U.S. at 302 (military); *Stanley*, 483 U.S. at 679 (same); *Meyer*, 510 U.S. at 486 (public purse); *Wilkie*, 551 U.S. at 561–62 (federal land)). Indeed, Congress took steps to ensure that the protections it provided in the INA would be exclusive of any additional judicial remedy. *See* 8 U.S.C. § 1252(b)(9) ("Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section"); *id.* § 1252(g) ("Except as provided in this section . . . , no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien"); *id.* § 1226(e) (limiting court review of the Attorney General's decisions to arrest and detain aliens).

In the same vein, where Congress has provided "an alternative remedial structure . . . , that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S. Ct. at 1858. And the INA does indeed contain such a remedial structure. *See, e.g.*, 8 C.F.R. § 287.8 (establishing "standards for enforcement activities" conducted under the INA); *id.* § 287.10 (providing for an "[e]xpedited internal review process" of alleged violations of the standards established in § 287.8); *id.* §§ 236.1(d), 1003.38 (providing persons detained under the INA an adversarial bond hearing, with a right to appeal); 8 U.S.C. § 1229a(b) (adversarial removal hearing); *id.* § 1252 (judicial review of removal orders); *see also Alvarez v. ICE*, 818 F.3d 1194, 1206 (11th Cir. 2016)

("The [INA] is 'an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations'" (quoting *Bush,* 462 U.S. at 388)); *De La Paz v. Coy*, 786 F.3d 367, 375–78 (5th Cir. 2015) (detailing the INA's "comprehensive regulation of all immigration related issues," including provisions "specifically designed to protect the rights of illegal aliens," and concluding that the INA "comprises . . . an elaborate remedial scheme [that] precludes creation of a *Bivens* remedy").

The plaintiffs are correct that the protections provided by the INA do not include a money damages remedy and often do not redress constitutional violations that occur apart from removal proceedings. But this misses the point, for the relevant question "is not what remedy the court should provide for a wrong that would otherwise go unredressed" but instead "whether an elaborate remedial system . . . should be augmented by the creation of a new judicial remedy." *Bush*, 462 U.S. at 388; *see also Chilicky*, 487 U.S. at 421–22 ("The absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation").

Congress's legislative actions in this area persuasively indicate that Congress did not want a money damages remedy against ICE agents for their allegedly wrongful conduct, as indicated by its frequent amendment of the INA and its repeated refusal to provide a damages remedy. *See, e.g.*, REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546; Antiterrorism and Effective Death

21

Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214; Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978; Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359; Act of Oct. 20, 1976, Pub. L. No. 94-571, 90 Stat. 2703; Act of Oct. 3, 1965, Pub. L. No. 89-236, 79 Stat. 911; *see also De La Paz*, 786 F.3d at 377 ("Despite its repeated and careful attention to immigration matters, Congress has declined to authorize damage remedies against individual agents involved in civil immigration enforcement. The institutional silence speaks volumes and counsels strongly against judicial usurpation of the legislative function"). And "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." *Abbasi*, 137 S. Ct. at 1865; *see id.* at 1862 (concluding that, as regarded the plaintiffs' conditions-of-confinement claims, Congress's failure to provide a damages remedy was instructive given its "frequent and intense" interest in the response to the September 11 attacks); *id.* at 1865 (reasoning that, as regarded the plaintiffs' prisoner abuse claims, Congress's failure to provide "a standalone damages remedy against federal jailers" in the Prison Litigation Reform Act, which was enacted after *Carlson*, arguably "suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment").

Finally, *Bivens* actions "have never [been] considered a proper vehicle for altering an entity's policy." *Malesko*, 534 U.S. at 74. Yet, this is what the plaintiffs appear to want. Allegations that they made in their initial complaint specifically targeted the Trump Administration's immigration enforcement policy with the purpose of altering it, even though they attempted in their amended complaint to distance themselves — at least

22

overtly — from alleging such a purpose, surely to avoid this very discussion. But their purpose was undoubtedly not abandoned, as betrayed by their extensive challenge to policy in their initial complaint *based on the same facts* and by their contention that the Trump Administration's policy gave rise to the conduct that they alleged *in both complaints* was illegal. *See United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) ("The law is quite clear that [superseded] pleadings constitute the admissions of a party-opponent and are admissible in the case in which they were originally filed as well as in any subsequent litigation involving that party. A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories"). This attack on executive policy represents yet another "special factor counselling hesitation." *Abbasi*, 137 S. Ct. at 1860.

\*       \*       \*

At bottom, we conclude that the plaintiffs' complaint seeks to extend the *Bivens* remedy to a new context and that the application of *Bivens* to this new context causes us to hesitate, as it raises the substantial question of whether Congress would want the plaintiffs to have a money damages remedy against ICE agents for their allegedly wrongful conduct when enforcing the INA. Accordingly, we conclude that no *Bivens* remedy is available. Because of this ruling, we do not reach the ICE agents' claim of qualified immunity. *See Wilkie*, 551 U.S. at 549 n.4.

We therefore reverse the district court's order denying the ICE agents' motion to dismiss and remand to the district court with instructions to dismiss the plaintiffs' action.

REVERSED AND REMANDED WITH INSTRUCTIONS