**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-1106**

---

WILLIAM M. BULGER, Administrator of the Estate of James Bulger,

        Plaintiff - Appellant,

      v.

HUGH HURWITZ, formerly John Doe 1 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; J. A. KELLER, formerly John Doe 3 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; ANGELA DUNBAR, formerly Jane Doe 4 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; R. C. CHEATHAM, formerly John Doe 5 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; CHARLES LOCKETT, formerly John Doe 6 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JOSEPH COAKLEY, formerly John Doe 7 and 8 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; AMY RUIZ, formerly Jane Doe 9 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JEFFREY SMITH, formerly John Doe 10 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; ALICE PISANESCHI, formerly Jane Doe 11 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JEREMY SHIRK, formerly John Doe 12 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; ANTHONY MORI, formerly John Doe 13 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; BRANDON BOLEDOVIC, formerly John Doe 14 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JOHN/JANE DOE 2, ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JOHN/JANE DOES 15-30, ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; UNITED STATES OF AMERICA,

        Defendants - Appellees.

---

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg.  John Preston Bailey, District Judge.  (3:20-cv-00206-JPB-RWT)

_____

Argued:  January 26, 2023                           Decided:  March 3, 2023

_____

Before DIAZ and THACKER, Circuit Judges, and Catherine C. EAGLES, United States District Judge for the Middle District of North Carolina, sitting by designation.

_____

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge Diaz and Judge Eagles joined.

_____

**ARGUED:**  Jay T. McCamic, MCCAMIC LAW FIRM, PLLC, Wheeling, West Virginia, for Appellant.  Martin V. Totaro, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  Anthony I. Werner, JOHN & WERNER LAW OFFICES, PLLC, Wheeling, West Virginia; L. Dante' DiTrapano, Sean B. Shriver, CALWELL LUCE DITRAPANO PLLC, Charleston, West Virginia, for Appellant.  Brian M. Boynton, Principal Deputy Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William Ihlenfeld, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellees.

_____

2

THACKER, Circuit Judge:

William Bulger, on behalf of the Estate of former federal inmate James "Whitey" Bulger ("Bulger"), brought suit against the United States and several Federal Bureau of Prisons ("BOP") officials after Bulger was allegedly beaten to death by fellow inmates. The Estate ("Appellant") alleges that BOP officials violated the Eighth Amendment by failing to protect Bulger from the attack and failing to intervene to prevent Bulger's transfer to a "violent" facility. Appellant also sued the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), alleging that prison officials had been negligent in their failure to intervene and protect Bulger.

Appellant argues that its Eighth Amendment claims are cognizable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny. Alternatively, if Appellant's claims are not authorized by the existing *Bivens* cases, Appellant requests that we extend *Bivens* to cover its claims.

For the reasons set forth below, we conclude that Appellant's *Bivens* claims arise in a new context and that several special factors, including separation-of-power implications and an increased burden on the federal prison system, counsel against an extension of *Bivens* in this new context. We also conclude that the discretionary function exception to the FTCA applies to BOP officials' decisions to transfer Bulger and place him in general population.

Accordingly, we affirm the district court's order dismissing Appellant's claims.

3

I.

On October 30, 2018, at approximately 8:20am, BOP staff members found Bulger dead in his cell at the United States Penitentiary ("USP") Hazelton ("Hazelton"), located in Bruceton Mills, West Virginia. While Bulger's exact time of death is unknown, he had been housed at Hazelton for less than 14 hours, having arrived on the night of October 29, 2018, following his transfer from USP Coleman II ("Coleman") in Sumterville, Florida.

Bulger gained notoriety as the leader of the Winter Hill Gang, a loose confederation of organized crime figures in the Boston, Massachusetts area. As the leader, Bulger engaged in myriad illegal activities, including murder, drug dealing, extortion, bookmaking, and weapons trafficking. Despite his criminal history and role as a violent organized crime leader, the Federal Bureau of Investigation ("FBI") secretly recruited Bulger to be an informant in 1975. During his time as an informant, Bulger continued to be responsible for widespread criminal activity, including numerous murders.

In 1994, Bulger fled the Boston area and went into hiding after his former FBI handler tipped him off about a pending indictment against him. Bulger was on the FBI's 10 Most Wanted Fugitives list for over a decade until he was finally arrested in 2011. On August 12, 2013, a federal jury convicted Bulger of numerous violent crimes, including the murder of 11 individuals. As a result, Bulger was sentenced to two consecutive life sentences plus five years.

4

According to the complaint herein, at the time of his sentencing, Bulger suffered from "a pre-existing heart condition." J.A. 40.[1] The BOP assigns medical care levels to inmates based on a variety of factors, with medical care level one corresponding to inmates with the least medical need and level four corresponding to inmates with the greatest medical need. The BOP then places inmates at institutions commensurate with the level of medical care the inmate requires. In January 2014, the BOP identified Bulger as a medical care level four inmate and housed him at the USP Tucson ("Tucson") in Tucson, Arizona.[2] On September 3, 2014, the BOP transferred Bulger from Tucson to Coleman. Both Tucson and Coleman are known colloquially within the BOP as "soft yards" where inmates who are vulnerable, medically compromised, or need protection are placed. *Id.* at 39–40. Both penitentiaries are high-security facilities able to provide inmates with level four medical care.

In April 2018, officials at Coleman began an eight-month effort to transfer Bulger to another BOP institution. The officials' initial transfer request "was coded to indicate Bulger required a higher level of medical care, or Care Level [four], for inmates who are severely impaired and may require daily nursing care." J.A. 214. Because his high care level limited the number of institutions where Bulger could be designated, the April request was denied. In October 2018, Coleman officials resubmitted their transfer request, this

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] After he was assaulted while housed in general population, Bulger spent time in a Special Housing Unit at Tucson, where he was separated from the general inmate population and housed alone in a single cell.

time indicating that Bulger was a medical care level two. The BOP approved Bulger's transfer to Hazelton, a medical care level two institution. At the time of his transfer, Bulger was 89 years old and utilized a wheelchair for long-distance mobility.

Bulger arrived at Hazelton on October 29, 2018, at approximately 6:49pm. Bulger had a "social interview" at 7:25pm, and at 8:21pm, after staff reviewed his Presentence Investigation Report and Inmate Central File, he was referred for a psychological exam. J.A. 108. According to Joshua Brawley, Executive Assistant at Hazelton, "[W]ithin 24 hours of an inmate's arrival, medical staff [are required to] screen the inmate in compliance with BOP medical procedures to determine if there are medical reasons for housing the inmate away from general population." *Id.* However, it is unknown whether Bulger actually received the required psychological exam or any other medical screening while at Hazelton.

The night of his arrival at Hazelton, Bulger was placed in the general population. The following morning at 8:20am -- less than 14 hours after his arrival -- BOP staff found Bulger unresponsive in his cell. According to the complaint, "within hours of [that] placement," inmates "believed" to be from New England and loyal to the mafia killed Bulger using a "lock in a sock" bludgeoning weapon. J.A. 42.

Appellant sued the United States and several BOP employees for their alleged roles in Bulger's transfer to Hazelton, placement in the prison's general population, and

6

subsequent death.    Appellant's amended complaint[3] includes three counts and seeks compensatory and punitive damages.  The first two counts are brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against 12 named and 17 unnamed BOP employees in their individual capacities.  The first *Bivens* count claims that the individual defendants failed to protect Bulger in violation of the Eighth Amendment.  The second *Bivens* count claims that the individual defendants failed to intervene to prevent Bulger's transfer to Hazelton and subsequent murder in violation of the Eighth Amendment.  The third count claims negligence by the United States pursuant to the FTCA.  In support of its claims, Appellant alleges that Hazelton "was not an appropriate placement" for Bulger because of his age, frailty, health, reputation as a "snitch" informing on mafia members, and reputation as an alleged child molester, i.e., a "chomo."  J.A. 36, 42.

On January 12, 2022, the district court granted motions to dismiss filed by the individual defendants and the United States.  With respect to Appellant's *Bivens* claims, the district court concluded that the "claims regarding failure to protect and failure to intervene are clearly a new [*Bivens*] context," J.A. 263, and that it would be improper to expand *Bivens* to that new context because "multiple special factors counsel against creating a new *Bivens* remedy," *id.* at 266.  With respect to Appellant's FTCA claims, the

---

[3] On September 1, 2021, Appellant's original complaint was amended without objection to include the names of some of the previously unknown individual defendants.

district court concluded that the FTCA's discretionary function exception barred the estate's claims because "[d]ecisions about how to safeguard prisoners are generally discretionary." *Id.* at 284. Accordingly, the district court denied Appellant's request for leave to conduct discovery in support of its FTCA claim, relying squarely on our decision in *Rich v. United States*, 811 F.3d 140, 146 (4th Cir. 2015), in which we concluded that a FTCA plaintiff was not entitled to discovery regarding the decision of federal prison officials not to separate the plaintiff from other prisoners.

On January 31, 2022, Appellant filed a timely appeal.

## II.

We review a district court's grant of a motion to dismiss and dismissal for lack of subject matter jurisdiction de novo. *Stahle v. CTS Corp.*, 817 F.3d 96, 99 (4th Cir. 2016) (motion to dismiss); *Pornomo v. United States*, 814 F.3d 681, 687 (4th Cir. 2016) (lack of subject matter jurisdiction). "We review a denial of jurisdictional discovery for abuse of discretion." *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015).

## III.

## A.

42 U.S.C. § 1983 authorizes plaintiffs to bring an action for money damages against state and local government officials who, while acting "under color of state law," violated the plaintiffs' constitutional rights. However, there is no statutory counterpart under which plaintiffs can sue federal officials for constitutional violations. *Bivens* provides the federal analog to § 1983 claims. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 391 n.4, 396 (1971).

8

In *Bivens*, the Supreme Court held that an "implied" cause of action under the Fourth Amendment entitled plaintiffs to sue federal officials for money damages arising from unreasonable searches and seizures. *See Bivens*, 403 U.S. at 396–97. Although the Fourth Amendment does not explicitly "provide for its enforcement by an award of money damages," the Court found that no "explicit congressional declaration" forbade such a remedy and inferred a cause of action from general principles of federal jurisdiction to "use any available remedy to make good the wrong done." *Id.* (internal quotation marks omitted).

Following *Bivens*, the Court found two more implied causes of action for money damages under the Fifth and Eighth Amendments. In *Davis v. Passman*, 442 U.S. 228 (1979), the Court held that a former congressional administrative assistant could proceed on her claim for money damages against her employer, a member of Congress who had terminated her employment because of her sex, pursuant to the Fifth Amendment's Due Process Clause. *Davis*, 442 U.S. at 248. And in *Carlson v. Green*, 446 U.S. 14 (1980), the Court held that an inmate's estate could proceed on a claim for money damages against prison officials for allegedly violating the inmate's Eighth Amendment right to be free from deliberate indifference to his serious medical needs by failing to treat the inmate's asthma, leading to his death. *Carlson*, 446 U.S. at 24–25.

Though it initially described *Bivens* broadly as establishing that "the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right," *Carlson*, 446 U.S. at 18, in the 43 years since *Carlson*, the Court has "consistently rebuffed" requests

9

to expand implied *Bivens* actions. *Hernandez v. Mesa*, 140 S. Ct. at 735, 743 (2020); *see also Egbert v. Boule*, 142 S. Ct. 1793, 1799 (2022). In the last five years alone, the Court has scaled back *Bivens* significantly, delivering a trilogy of opinions expressing opposition toward any expansion of *Bivens* actions. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (noting that "expanding the *Bivens* remedy is now considered a disfavored judicial activity" (internal quotation marks omitted)); *Hernandez*, 140 S. Ct. at 742–43 (noting that if "the Court's three *Bivens* cases [had] been . . . decided today, it is doubtful that we would have reached the same result" (alterations in original) (internal quotation marks omitted)); *Egbert*, 142 S. Ct. at 1802 ("Now long past the heady days in which this Court assumed common-law powers to create causes of action [as in *Bivens*], we have come to appreciate more fully the tension between judicially created causes of action and the Constitution's separation of legislative and judicial power." (internal quotation marks and citations omitted)).

The Supreme Court has continued to caution lower courts to beware of "arrogating legislative power." *Hernandez*, 140 S. Ct. at 741. Because "creating a cause of action is a legislative endeavor," the Court warned that "the Judiciary's authority to [create causes of action under the Constitution] is, at best, uncertain." *Egbert*, 142 S. Ct. at 1802–03. And in *Ziglar*, the Court explained:

> [I]t is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation.

10

137 S. Ct. at 1856. However, the Court has chosen not to overrule its three *Bivens* cases, electing instead to severely limit the reach of *Bivens* by imposing a highly restrictive two-step analysis for *Bivens* cases. *Hernandez*, 140 S. Ct. at 743.

First, a court must determine whether a claim falls within the causes of action authorized under the Supreme Court's three *Bivens* cases -- *Bivens*, *Davis*, and *Carlson* -- or whether it "arises in a 'new context' or involves a 'new category of defendants.'" *Hernandez*, 140 S. Ct. at 743 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). A context is "new" when it is "different in a meaningful way from previous *Bivens* cases decided by [the] Court." *Ziglar*, 137 S. Ct. at 1859.

If a court finds that a claim presents a "new context" different from the three *Bivens* cases, it must "proceed to the second step and ask whether there are any special factors that counsel hesitation about granting the extension" of *Bivens*. *Hernandez*, 140 S. Ct. at 743 (internal quotation marks and alterations omitted). This "special factors" inquiry must focus on "separation-of-powers principles" and requires courts to ask whether judicial intrusion into a given field is appropriate. *Id.* (quoting *Ziglar*, 137 S. Ct. at 1857). As the Court explained:

> [I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.

11

*Ziglar*, 137 S. Ct. at 1858.  Thus, where there is "reason to pause before applying *Bivens* in a new context or to a new class of defendants," a court should not extend *Bivens*. *Hernandez*, 140 S. Ct. at 743.

Here, Appellant argues that its *Bivens* remedy remains a viable claim brought pursuant to the Eighth Amendment and that the "individual defendants are liable for violating . . . Bulger's constitutional rights because they were deliberately indifferent to the substantial risk of serious harm that he faced in being sent to Hazelton."  Appellant's Opening Br. at 14.  Appellant alleges that federal officers failed to protect Bulger by "inexplicably plac[ing] [Bulger] into the general population" at Hazelton despite knowing the facility was "an extremely dangerous environment" for a prisoner like Bulger who was both medically vulnerable and had a reputation as a "snitch" and child molester.  *Id.* Appellant maintains that its "failure to protect" and "failure to intervene" claims "do not present a new *Bivens* context" because they fall within the class of *Bivens* actions acknowledged by the Supreme Court in *Carlson* and *Farmer v. Brennan*, 511 U.S. 825 (1994).  *Id.* at 12 (internal quotation marks omitted).  Alternatively, Appellant argues that if its claims are found to arise in a new *Bivens* context, we should conclude that "no alternative, existing remedies and no 'special factors' . . . counsel hesitation in creating a *Bivens* remedy here."  *Id.* at 18.

1.

Appellant's Eighth Amendment Claims Present a New *Bivens* Context

We first address whether Appellant's Eighth Amendment claims fall within the context of *Bivens* and its progeny.  The Supreme Court has warned lower courts to act with

12

utmost hesitation when faced with actions that do not fall precisely under *Bivens*, *Davis*, or *Carlson*, and this court has repeatedly heeded that warning. *See, e.g.*, *Dyer v. Smith*, 56 F.4th 271, 275 (4th Cir. 2022) (rejecting request to extend *Bivens* to claims against Transportation and Security Administration officers for violations of the First and Fourth Amendments); *Tate v. Harmon*, 54 F.4th 839, 841–42 (4th Cir. 2022) (rejecting request to extend *Bivens* to claims of "degenerate" conditions of confinement in violation of the Eighth Amendment); *Annappareddy v. Pascale*, 996 F.3d 120, 126 (4th Cir. 2021) (rejecting request to extend *Bivens* to claims against federal prosecutors and investigators for violations of the Fourth and Fifth Amendments); *Earle v. Shreves*, 990 F.3d 774, 776 (4th Cir. 2021) (rejecting request to extend *Bivens* to claims of unlawful retaliation by prison officials for filing grievances in violation of the First Amendment); *Tun-Cos v. Perrotte*, 922 F.3d 514, 517–18 (4th Cir. 2019) (rejecting request to extend *Bivens* to claims of unlawful searches and seizures by Immigration and Customs Enforcement agents in violation of the Fourth and Fifth Amendments).

But Appellant contends that its Eighth Amendment failure to protect and intervene claims against BOP officials do not present a new *Bivens* context because they are sufficiently akin to the Supreme Court's decisions in *Carlson* and *Farmer*. We disagree.

"[A] new context may arise if *even one* distinguishing fact has the potential to implicate separation-of-powers considerations." *Tate*, 54 F.4th at 846 (emphasis in original) (citing *Egbert*, 142 S. Ct. at 1805). To be sure, the claim authorized in *Carlson* was an Eighth Amendment claim. However, the Supreme Court has made clear that courts should not interpret *Carlson* to apply outside the precise context at issue in that case, noting

13

that even claims challenging the adequacy of medical care may involve the same "right and . . . mechanism of injury" as in *Carlson* but still present "different" contexts. *Ziglar*, 137 S. Ct. at 1859 (discussing *Malesko*, 534 U.S. at 70, and n.4). As noted, *Carlson* involved a prison official's deliberate indifference to an inmate's health by failing to provide competent medical care after the inmate suffered a severe asthma attack, allegedly leading to the inmate's death. *Carlson*, 446 U.S. at 16. Here, Appellant's claims are premised not on a failure to provide adequate medical care but on BOP officials' failure to stop Bulger's transfer to Hazelton and protect Bulger from prisoner-on-prisoner violence. Such claims exceed the bounds of liability the Court's previous *Bivens* actions established, implicating "not only the scope of [each official's] responsibilities and duties" but also the organizational policies, administrative decisions, and economic concerns inextricably tied to inmate transfer and placement determinations. *Tate*, 54 F.4th at 846. Thus, Appellant's claims are, we conclude, materially distinct from a failure to provide adequate medical care claim like the one presented in *Carlson*.

Nonetheless, even if Appellant could make out a claim for an alleged failure to provide constitutionally adequate medical treatment, a lack of competent medical care did not cause Bulger's death. Given this meaningful difference, we conclude that Appellant's failure to protect and intervene claims are not authorized by *Carlson* but instead present a new context.

Likewise, Appellant's reliance on *Farmer* is misplaced. In *Farmer*, an inmate brought a *Bivens* suit pursuant to the Eighth Amendment against prison officials for allegedly failing to protect the inmate from a violent beating and rape, even though the

14

officials knew that the prison had a "violent environment" and the inmate was "particularly vulnerable to sexual attack." 511 U.S. at 831. As a panel of this court has already noted, "while the [Supreme] Court allowed the action [in *Farmer*] to proceed, it never addressed whether the claim was properly a *Bivens* claim." *Tate*, 54 F.4th at 847. Rather, the Court heard the case in order to resolve a circuit split regarding the proper legal test for deliberate indifference. *Farmer*, 511 U.S. at 832. Although "[t]he Court acknowledged that the action was brought under *Bivens*," it "did not question the propriety of the *Bivens* remedy in that case," and the parties did not brief the issue. *Earle*, 990 F.3d at 778 n.1. Moreover, the Court has never listed *Farmer* when compiling *all* of its *Bivens* cases. *See Egbert*, 142 S. Ct. at 1799–1800, 1802; *Hernandez*, 140 S. Ct. at 741, 743; *Ziglar*, 137 S. Ct. at 1854–55, 1857. Therefore, Appellant's theory that *Farmer* recognized a fourth context of *Bivens* claims beyond the issues presented in *Bivens*, *Davis*, and *Carlson* is contrary to the Supreme Court's recognition that it "has refused" to "extend *Bivens* to any new context" for "the past 30 years," which includes the time period it decided *Farmer*. *Ziglar*, 137 S. Ct. at 1857.

Appellant places considerable reliance on the Third Circuit's decision in *Bistrian v. Levi*, 912 F.3d 79 (3d Cir. 2018), in which the Third Circuit held that prisoner-on-prisoner violence and failure to protect claims are not new contexts for *Bivens* claims. *Id.* at 88. In *Bistrian*, a federal inmate claimed that prison officials violated his Eighth Amendment rights by failing "to protect him from other prisoners and punitively detain[ing] him" in a special housing unit. *Id.* at 83. The Third Circuit analogized the facts in *Bistrian* to those in *Farmer* and allowed the inmate's *Bivens* claim to proceed. *Id.* at 90–92. Although it

15

recognized that *Farmer* "did not explicitly state that it was recognizing a *Bivens* claim," the Third Circuit expressly relied on *Farmer* to support its conclusion that the inmate's failure to protect claim did not arise in a new context. *Id.* at 90–91.

The Third Circuit attempted to reconcile its approach in *Bistrian* with the *Ziglar* Court's purposeful omission of *Farmer* as one of its *Bivens* cases by speculating, "It may be that the [Supreme] Court simply viewed the failure-to-protect claim as not distinct from the Eighth Amendment deliberate indifference claim in the medical context." 912 F.3d at 91. However, the Third Circuit did not have the benefit of the Court's more recent *Bivens* guidance, as *Bistrian* was decided before the Court's decisions in *Hernandez* and *Egbert*, both of which also list *Bivens*, *Carlson*, and *Davis* as the *only* three cases in which the Court has implied a *Bivens* action. *See Hernandez*, 140 S. Ct. at 741, 743; *Egbert*, 142 S. Ct. at 1799–1800, 1802. Despite ample opportunity to include *Farmer*, the Court has made clear that the universe of recognized *Bivens* claims consists of only three cases: *Bivens*, *Davis*, and *Carlson*. *Ziglar*, 137 S. Ct. at 1859. And lower courts should not interpret these cases to apply outside the precise contexts at issue. *Id.*; *see also Tun-Cos*, 922 F.3d at 523 (noting that "quite minor" differences may amount to a new *Bivens* context).

Accordingly, we find Appellant's reliance on the Third Circuit's *Bistrian* decision unavailing as neither *Bivens*, *Davis*, nor *Carlson* involved an official's alleged failure to intervene and stop an inmate's transfer to a particular facility or failure to protect an inmate from prisoner-on-prisoner violence. Thus, such claims, we conclude, arise in a new context.

16

2.

<u>Special Factors Counsel Against Extending *Bivens* to Encompass Appellant's Claims</u>

Appellant contends that even if its claims arise in a new context, there are no special factors counseling against an extension of *Bivens* here. Again, we disagree.

When determining whether to extend *Bivens* to new contexts, courts are instructed to consider "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Ziglar*, 137 S. Ct. at 1858. Although the Supreme Court has not provided an exhaustive list of "special factors," we have previously enumerated several factors that the Court has noted would counsel hesitation for any extension of *Bivens*:

> (1) "uncertainty alone" as to whether allowing a *Bivens* claim would have systemwide consequences, *Egbert*, 142 S. Ct. at 1804; (2) a "new category of defendants," *Malesko*, 534 U.S. at 68; (3) a difference as small as the "rank of the officers involved," *Ziglar*, 137 S. Ct. at 1860; (4) the "statutory or other legal mandate under which the officer was operating," *id.*; (5) a "potential effect on foreign relations," *Hernandez*, 140 S. Ct. at 744, and "national security," *id.* at 746–47; (6) Congress[] "repeatedly declin[ing] to authorize the award of damages" in the relevant context, *id.* at 747; and (7) the risk that "the burden and demand of litigation" would prevent Executive Officials "from devoting the time and effort required for the proper discharge of their duties," *Ziglar*, 137 S. Ct. at 1860.

*Tate*, 54 F.4th at 846. Courts are also instructed to look to whether "there is an alternative remedial structure present in a certain case." *Ziglar*, 137 S. Ct. at 1858. "An alternative remedy weighs against recognizing a new *Bivens* claim even if it is less effective than the damages that would be available under *Bivens* and is not expressly identified by Congress as an alternative remedy." *Dyer*, 56 F.4th at 279.

17

There is an overlap between the factors courts are to consider when determining whether a purported *Bivens* claim arose out of a "new context" and whether special factors counsel hesitation for any extension of *Bivens*. *Egbert*, 142 S. Ct. at 1803. Thus, while the Court's cases "describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.*

Below, the district court correctly concluded that "multiple special factors counsel against creating a new *Bivens* remedy." J.A. 266. First, as the district court explained, Appellant's claims would "require scrutiny of new categories of conduct and a new category of defendants—namely, BOP employees involved in transferring inmates and managing the agency's housing system." *Id.* at 263 (internal quotation marks omitted). Second, Appellant's claims "intersect with the statutory scheme delegating authority over prison designation, transfer, and housing decisions to the BOP." *Id.* (citation omitted).

Third, inmates have "an 'alternative remedial structure' for protecting a prisoner's interest in avoiding unwanted housing placements" that allows a prisoner to seek equitable relief for issues related to confinement. J.A. 270 (quoting *Ziglar*, 137 S. Ct. at 1858). Specifically, the BOP's Administrative Remedy Program ("ARP") allows "all inmates in institutions operated by the Bureau of Prisons," 28 C.F.R. § 542.10(b), "to seek formal review of an issue relating to any aspect of his/her own confinement," *id.* § 542.10(a). Although "the ARP does not include a money damages remedy," inmates may file "an administrative grievance" with the BOP or seek "an injunction" in federal court to stop a pending transfer to a new facility. J.A. 271 (internal quotation marks and citation omitted).

18

Appellant challenges the sufficiency of the ARP, arguing that Bulger did not have enough time to avail himself of the remedies offered by the ARP either before his transfer to Hazelton or before he was killed. Appellant claims that for security reasons, "inmates are not informed (nor are their counsel) of when and where they are to be transported." Appellant's Opening Br. at 19. And, given the short window of time that Bulger was at Hazelton, Appellant argues that he would have had no real opportunity to initiate any sort of formal grievance process. Thus, Appellant contends, this is a case where "it is damages or nothing." *Id.* (quoting *Bistrian*, 912 F.3d at 92).

Significantly, however, "the relevant question 'is not what remedy the court should provide for a wrong that would otherwise go unredressed' but instead 'whether an elaborate remedial system . . . should be augmented by the creation of a new judicial remedy.'" *Tun-Cos*, 922 F.3d at 527 (quoting *Bush v. Lucas*, 462 U.S. 367, 388 (1983)). The ARP is the "means through which allegedly unconstitutional actions and policies can be brought to the attention" of the BOP. *Malesko*, 534 U.S. at 74. The potential unavailability of a remedy in a particular circumstance does not warrant supplementing that scheme. *See, e.g.*, *Earle*, 990 F.3d at 780 (declining to extend *Bivens* to include a claim for retaliatory confinement, in part, because the ARP is a "special factor[] that counsel[s] hesitation"); *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988) (declining to imply a *Bivens* remedy for due process claims arising from the denial of Social Security benefits despite the unavailability of compensatory damages under an alternate remedial scheme).

Additionally, allowing Appellant's *Bivens* claims to proceed would conflict with Congress's choice "to give the BOP discretion over inmate placement, prohibit courts from

19

reviewing inmate placement, and omit an individual-capacity damages remedy" from the Prison Litigation Reform Act ("PLRA"). J.A. 269. The PLRA, which Congress enacted one year after the Supreme Court decided *Farmer*, was designed to "limit litigation brought by prisoners," *Montcalm Pub. Corp. v. Virginia*, 199 F.3d 168, 171 (4th Cir. 1999), and "remove the federal district courts from the business of supervising the day-to-day operation" of prisons, *Cagle v. Hutto*, 177 F.3d 253, 257 (4th Cir. 1999). The PLRA "does not provide for a standalone damages remedy against federal jailers." *Ziglar*, 137 S. Ct. at 1865. Given circumstances like the one that confronts us today, "[i]nstitutional silence speaks volumes and counsels strongly against judicial usurpation of the legislative function." *Tun-Cos*, 922 F.3d at 527. Accordingly, because Congress has expressed a desire to prevent courts from interfering with BOP decisions and has been "conspicuously silent about creating a remedy for prisoners to obtain damages from individual officers," the existence of the ARP and PLRA counsel hesitation in extending *Bivens* to Appellant's claims. J.A. 269.

Finally, a "substantial burden . . . would be placed on government operations if the [c]ourt were to authorize a new category of prison litigation." J.A. 272. Appellant's claim seeks to impose liability on prison officials on a systemic level. Determinations about the adequacy of a particular facility to meet the medical needs of an inmate and to provide the level of supervision deemed necessary are typically the subject of broad policies and systemwide procedures that involve a multitude of decisionmakers on almost every level of the BOP's organizational hierarchy. As the *Egbert* Court noted:

20

> The *Bivens* inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action. A court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed.

142 S. Ct. at 1805 (internal quotation marks omitted) (emphasis in original). We are ill-suited to "predict the systemwide consequences of recognizing a cause of action under *Bivens*" in this context and Congress is "better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." *Id*. at 1803–04 (internal quotation marks omitted).

Because each special factor independently presents a "sound reason[] to think Congress might doubt the efficacy or necessity of a damages remedy" in this new context, *Ziglar*, 137 S. Ct. at 1858, we affirm the district court's order dismissing Appellant's *Bivens* claims.

## B.

The FTCA effects a limited waiver of sovereign immunity and creates a cause of action for certain tort claims against the United States "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). However, there are several exceptions that limit the FTCA's waiver of sovereign immunity.

Relevant here, the discretionary function exception bars suit for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether

21

or not the discretion involved be abused." 28 U.S.C. § 2680(a). This provision -- which we have previously branded as the FTCA's "most important" exception, *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006) -- was designed "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 814 (1984); *see also Wood v. United States*, 845 F.3d 123, 128 (4th Cir. 2017) (explaining that the FTCA "shield[s] [discretionary] decisions of a government entity made within the scope of any regulatory policy expressed in statute, regulation, or policy guidance, even when made negligently"). "Because waivers of sovereign immunity must be strictly construed," *Wood*, 845 F.3d at 127, "FTCA plaintiffs have the burden of showing that the discretionary function exception does not foreclose their claim," *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 857 (4th Cir. 2016).

To determine whether the discretionary function exception applies in a particular case, we engage in a two-step analysis. First, we consider whether the conduct at issue "involves an element of judgment or choice." *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015). Conduct involves an element of judgment or choice unless a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988). A document that sets forth recommended actions or improvements does not demonstrate the absence of discretion. *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180–81 (4th Cir. 2009). Nor does a regulation that, although requiring adherence to a general

22

standard, fails to dictate a course of action for achieving that standard. *See Rich*, 811 F.3d at 145 (explaining that nothing in the relevant regulation "requires that any specific action be taken by the various prison officials"). Rather, the source of the directive must either expressly prescribe or proscribe "a particular course of action" in order to eliminate an agency's discretion for the purposes of the discretionary function exception. *Pornomo v. United States*, 814 F.3d 681, 691 (4th Cir. 2016); *see also Berkovitz,* 486 U.S. at 536 (noting that a government official lacks judgment or choice when "a federal statute, regulation, or policy *specifically* prescribes a course of action for an employee to follow").

Second, we consider whether the conduct at issue "involve[d] the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537. This inquiry focuses "not on the agent's subjective intent . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324. If the challenged actions or omissions satisfy those two steps, the government's conduct is considered "discretionary within the meaning of the exception," and courts lack jurisdiction "whether or not the discretion involved be abused." *Pornomo*, 814 F.3d at 687 (quoting 28 U.S.C. § 2680(a)).

Here, the challenged BOP actions -- assessing Bulger's medical condition, transferring him to Hazelton, and placing him within general population -- meet both of the requisite prongs. First, there was no federal statute, regulation, or policy that

23

"specifically prescribe[d] a course of action" with respect to the challenged conduct. *Berkovitz*, 486 U.S. at 536. The complaint cites a federal statute requiring the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and "provide for the protection . . . of all persons charged with or convicted of offenses against the United States." J.A. 47 (quoting 18 U.S.C. § 4042(a)(2)–(3)). However, the "broad directives" in that statute afford the BOP "discretion regarding the implementation of those mandates." *Rich*, 811 F.3d at 145. The statute does not dictate any particular course of action or proscribe certain conduct. Given the general language of the statute, prison officials exercise broad discretion in safeguarding and protecting inmates. Thus, the first prong of the discretionary function exception is satisfied.

Turning to the second step of the inquiry, because decisions concerning "where to place inmates and whether to keep certain individuals . . . separated" invoke several policy considerations for prison officials, "they are precisely the kind of determinations that the discretionary function exception is intended to protect." *Rich*, 811 F.3d at 146. "Factors such as available resources, proper classification of inmates, and appropriate security levels are inherently grounded in social, political, and economic policy." *Id.* (internal quotation marks omitted). "[P]risoner placement and the handling of threats posed by inmates against one another are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons." *Id.* at 145 (internal quotation marks omitted) (agreeing with the reasoning of other circuit courts). Therefore, because the challenged actions in this case satisfy both steps of the inquiry, we hold that

24

the discretionary function exception shields Appellees from liability for the decisions of BOP officials regarding Bulger's transfer and placement in general population.

### C.

We also hold that the district court did not abuse its discretion by "follow[ing] the lead" of our decision in *Rich* and denying Appellant's request for leave to conduct discovery in support of its FTCA claim. J.A. 285. In *Rich*, an inmate sued the United States pursuant to the FTCA, alleging that prison officials had been negligent in failing to protect him from an attack in the recreation area by a white supremacist group known as the "Aryan Brotherhood." 811 F.3d at 142. The district court granted the government's motion to dismiss for lack of subject matter jurisdiction, concluding that "the discretionary function exception to the FTCA applied both to the prison officials' decision not to separate [the inmate] from his attackers, as well as to the manner in which the officials searched other inmates prior to placing them with [the inmate] in the recreation [area]." *Id.* The court also held that the inmate was "not entitled to discovery" with respect to "the decisions of [prison] officials regarding prisoner placement . . . because no facts that [the inmate] could uncover in discovery would establish jurisdiction." *Id.* at 146.

Because prisoner transfer and placement decisions necessarily implicate policy considerations, discovery would serve no proper purpose in this case. Even accepting all of Appellant's allegations regarding Bulger's care level designation and status as true, the discretionary function exception would still apply to the decisions the officials made regarding Bulger's placement, ultimately depriving this court of jurisdiction. *See Rich*, 811 F.3d at 145 (observing that while Congress charged the BOP with protecting and

25

safekeeping federal inmates, it afforded BOP officials "discretion regarding the implementation of those mandates" and did so to accomplish "the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons" (internal quotation marks omitted)).

Appellant argues that some "unknown facts and policies" potentially revealed through discovery "could very well directly impact the FTCA claims." Appellant's Opening Br. at 25. Specifically, Appellant seeks documents related to potential missteps by prison employees when addressing "security and medical concerns relating to [Bulger's] ongoing treatment and final placement at Hazelton." *Id.* But even if Appellant could obtain such documents, prisoner placement decisions are discretionary, and the discretionary function exception applies "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see also Wood*, 845 F.3d at 127–28. Because considerations like internal security and the availability of administrative resources "would be inevitably implicated" in any policies that led to the transfer and placement of Bulger, nothing would be gained by the discovery Appellant seeks. *Seaside Farm*, 842 F.3d at 860; *see also Gonzalez v. United States*, 814 F.3d 1022, 1031–32 (9th Cir. 2016) (refusing discovery because available agency guidelines granted discretion); *Baer v. United States*, 722 F.3d 168, 176–77 (3d Cir. 2013) (refusing discovery because plaintiffs could not establish a "reasonable expectation that discovery will reveal evidence of" an agency policy that "would overcome application of the discretionary function exception"); *Davila v. United States*, 713 F.3d 248, 263–64 (5th Cir. 2013) (refusing discovery because the plaintiff failed to

26

allege any "well-pleaded facts or evidence to refute the government's assertion . . . that no [nondiscretionary] policy exists").

In *Rich*, we did remand for "discovery on the issue whether and how the prison officials performed the patdowns and searches, and whether more specific directives existed regarding the manner of performing the patdowns and searches." 811 F.3d at 148. That decision, however, reflects our recognition that claims involving negligent patdowns, unlike claims involving prisoner placement, are not facially protected by the discretionary function exception since the BOP Program Statement suggested that more specific directives existed. Significantly, while the prison officials in *Rich* may have erred in how they followed policies "regarding prisoner placement" or were negligent in their "decision to not separate [the plaintiff] from his attackers," we did not permit discovery into those topics because we determined that such decisions were inherently discretionary. *Id.* at 146. Appellant's view would permit a FTCA plaintiff to obtain discovery anytime they surmise, without basis, the existence of some unspecified mandatory policy or procedure that might have an unexplained bearing on the case. Such free-ranging discovery would "undermine the discretionary function exception and introduce the very litigation pressures that Congress meant to avoid when it developed the exception." *Crawford v. United States*, No. 1:17-cv-224, 2019 WL 2366017, at *7 (N.D. W. Va. June 4, 2019) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985)).

Therefore, because Appellant could not uncover any facts that would establish jurisdiction through discovery, the district court did not abuse its discretion in refusing

discovery regarding Appellees' decision to transfer Bulger to Hazelton and place him in general population.[4]

IV.

For the foregoing reasons, the district court's order dismissing Appellant's *Bivens* and FTCA claims is

*AFFIRMED.*

---

[4] We note that on December 7, 2022, the Department of Justice completed its investigation into Bulger's placement at Hazelton and subsequent death and issued a report titled "Investigation and Review of the Federal Bureau of Prisons' Handling of the Transfer of Inmate James 'Whitey' Bulger." ECF No. 40-2. On December 22, 2022, Appellant moved to supplement the record with this report. ECF No. 40-1. We take judicial notice of the report pursuant to Federal Rule of Evidence 201. Therefore, we deny Appellant's motion to supplement the record as moot. Nonetheless, nothing in the report alters our opinion. For example, the report identifies the BOP's "2014 Medical Care Level Guidelines" as those in place during the relevant time period and notes that such guidelines "allowed BOP healthcare providers to exercise their clinical judgment." ECF No. 40-2, at 13. While the report acknowledges that "certain medical conditions and certain types of interventions required default medical care level classifications," the report also states, "as . . . written, there could be reasonable differences of opinion as to the appropriate medical care level for Bulger under the guidelines." *Id.* at 13, 65. The report further states, "BOP policy [did] not contain specific steps for [BOP officials] to take or criteria to consider before approving the transfer of a[n] . . . inmate, other than identifying [those inmates who needed to be separated from Bulger]." *Id.* at 68. Appellant has not alleged that BOP officials failed to identify those inmates before approving Bulger's transfer to Hazelton, and the DOJ report confirms that officials did, in fact, satisfy this requirement. *Id.*